## Southeastern Land Co. v. Louisville Gas & Electric Co.

(Decided Jan. 21, 1936.)

W. W. DOWNING for appellant.

CRAWFORD, MIDDLETON, MILNER & SEELBACH, CHARLES N. MILNER and J. DONALD DINNING for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

The Southeastern Land Company, a corporation, is appealing from a judgment sustaining a demurrer to and upon its failure to further plead, dismissing its petition whereby it sought to recover $4,473.66, including $1,251.18 interest, as alleged overcharge for electricity furnished it by the Louisville Gas & Electric Company, a public service corporation, from and including August, 1923, up to and including March, 1929.

Appellant owns a large office building in the city of Louisville known as the Realty building. Appellee under an ordinance of and contract with such city has for a number of years been furnishing electric current for light and power purposes to the city and its citizens. Section 3 (c) of the ordinance reads:

"The rates for electricity shall be uniform for equal service, and rates for power shall be the same to all consumers using equal amounts of electricity, under similar conditions, as to the maximum load and the relation of maximum load to the average. All rates for electricity shall be filed with the Board of Public Works of the City of Louisville and be open for public inspection. The company may make special contracts with consumers at rates based upon the amount of electricity used and the condition of the contract, which special rates may be less than those charged to consumers taking a smaller amount of electricity or taking electricity under different conditions, but said special rates shall be the same to all consumers using a like amount of electricity under the same contract conditions. A schedule of such special rates and contract conditions shall be filed with the Board of Public Works and each and every

charge therein shall also be filed with the Board of Public Works and be open to public inspection."

On January 15, 1919, real estate agents acting for appellant signed an application to appellee for electric service for the Realty building which, among other things, provided:

"All services to be rendered under this agreement shall be charged for at the rate fixed in Schedules D-1, F-3, of the Company's rates, which schedules are filed with the Board of Public Works of the City of Louisville, and made a part of this agreement."

This application was signed by an agent of appellee and constituted the contract between the parties. Schedule D-1 was a general lighting rate, and F-3 a general power rate, and current was furnished and paid for during the period of alleged overcharge under these schedules.

In addition to some of the foregoing facts, it is alleged in substance and effect in the petition that during the period of the alleged overcharge there was in effect a schedule known as G-3, containing rates that should have been charged plaintiff; that other customers using equal amounts of electricity under similar conditions as to the amount of maximum load and the relation thereof to the average were given an opportunity to and did use the rates charged for electricity under the G-3 schedule; that plaintiff was not given equal opportunity with other patrons to use the G-3 schedule of rates because it had no notice of such schedule, and the company in fraud of plaintiff's substantial rights intentionally failed to notify it of the available cheaper rate, although it knew it was greatly to plaintiff's advantage to accept the G-3 schedule.

It is further alleged that on August 24, 1920, plaintiff sold the Realty building to one M. E. Jonnard; that on June 20, 1921, in a suit pending in the Jefferson circuit court, a receiver was appointed by the court to handle the property, and on February 10, 1923, plaintiff again acquired it, the sale thereof to M. E. Jonnard having been set aside by the court as void; that the contract of January 15, 1919, between appellant and appellee, under its terms was not transferable and

new occupants of the premises are required to make application for service before commencing the use of electricity; that when the property was sold to Jonnard and again when it was placed in the hands of a receiver, the contract with appellant terminated, and therefore during the time complained of in the petition, no contract for the sale or use of electricity was entered into or existed between the parties to this action.

The petition gives a tabulation of the amounts paid for current for the various months during the period complained of under schedules D-1 and F-3, and the amounts that would have been paid for the corresponding period under schedule G-3, and the difference, whether greater or less, in plus and minus columns, and thus arrives at the amount of the alleged overcharge.

By answer appellee traversed the allegations of the petition and affirmatively alleged in effect that the rates under schedules D-1 and F-3 were general and uniform without any minimum requirements as to the amount of current used; that beginning in 1913 and continuing up to the time the answer was filed, appellee, as it was authorized to do under the ordinances and contract, had filed with the board of public works schedules of special or optional rates and contract conditions from time to time, and that such rates had during all such times been available to consumers who came within the classes designated in such schedules and applied alike to all consumers who availed themselves of such rates and using a like amount of electricity under the same contract conditions. These schedules as revised and changed during the period were known as G-1, G-2, and G-3, and afforded to consumer combined light and power rates. The answer set up the minimum charge under these various schedules and the contract conditions which the consumer obligated himself to assume in order to avail himself of these rates. It is further alleged and attempted to be demonstrated by a tabulation set forth in the answer that for the period complained of, appellant would have paid $398.77 more for its power bill under the optional schedules than it paid to appellee during the same period under schedules D-1 and F-3. In a third paragraph appellee interposed a plea of limitation for all amounts and claims for overcharges prior to September 12, 1928.

By reply appellant denied the material allegations of the answer and alleged certain affirmative matters which it is unnecessary to now detail since we shall further refer to the pleadings in disposing of the questions raised by brief.

A demurrer to the fourth paragraph of the reply was treated as a demurrer to the petition with the result above indicated.

It is first asserted by counsel for appellant that public utilities must not discriminate and may not impose different terms and conditions according to their caprice or whim upon different persons, and this we find to be a universal principle running through all authorities. Unquestionably appellant was entitled to the same consideration in the matter of facilities and rates as other customers under similar circumstances. The ordinance and contract as well as the law of the land which is embedded in a sound public policy forbids actual inequalities or discrimination in the character of service furnished by public utilities or in charges therefor. And what the utility is forbidden to do directly, it may not accomplish by indirection by way of resort to any device or subterfuge leading to the same result. If a utility company receives a fair return upon its capital investment, any discrimination in the form of rebates, free service, or inequality in rates will necessarily result in the less favored customer paying not only for his own service, but also for that of the patron receiving unwarranted concessions. A rebate resulting in a lower rate to one class than is paid by another is a violation of a contractual guarantee of uniformity and equality of rates. Union Light, Heat & Power Co. v. City of Fort Thomas, 261 Ky. 100, 87 S.W.(2d.) 103. Inequalities and apparent discriminations must necessarily arise out of different circumstances and conditions, but it is not every discrimination that is illegal. Impartial and uniform service to all customers similarly situated is the correct measure and means of securing them in their rights under the law. Bilton Machine Tool Co. v. United Illuminating Co., 110 Conn. 417, 148 A. 337, 67 A.L.R. 814; Pond on Public Utilities, sec. 270; State of Missouri v. Bell Telephone Co. (C.C.) 23 F. 539; Arkansas Natural Gas Co. v. Norton, 165 Ark. 172, 263 S.W. 775; North Carolina Public Service Co. v. Southern Power Co. (C.C.A.) 282 F. 837, 33 A.L.R. 626; P.U.R.1923A, 289.

It has come to be generally recognized that electric, gas, or water companies may make special or optional rates if based on a reasonable classification such as users of large quantities or their output, etc. See Spear & Co. v. Public Service Commission, 105 Pa. Super. 240, 161 A. 441, P.U.R.1932D, 384, and authorities therein cited. In the latter case it is held in effect that the fixing of optional rates which gives to the consumers of electricity a choice between two or more schedules does not indicate partiality or amount to illegal discrimination since the consumer may choose the rate most advantageous and suitable to his needs. See, also, Graver v. Edison Electric Illuminating Co., 126 App. Div. 371, 110 N. Y. S. 603.

It is next argued in effect that by its own terms the contract between appellant and appellee terminated when the property was sold to Jonnard in 1920, therefore it follows that there was no contract between the parties during the period in controversy, and in the absence of a contract the lowest rate was the proper rate. Brief for appellant quotes that part of the contract which reads:

"The consumer agrees to give notice in writing to the company when about to move and agrees to pay for all services furnished until such notice is given and the Company has made the final meter readings."

It is not alleged that appellant ever gave notice to appellee that it had sold or was about to quit the building. It is not even alleged that Jonnard ever took possession under the deed of 1920, but merely that for a time it was in the hands of a receiver and that in a litigation the conveyance was declared void. The recording of the deed to Jonnard was not such notice to appellee as would terminate the contract. Our recording statutes do not have the effect of carrying such notice. As already indicated, the contract for current to be furnished for the building was made with a real estate agent acting for appellant and it is apparent that the service continued under this contract.

It is next argued that the filing of a schedule with the board of public works in the city hall which was not recorded, indexed, stamped, or in a bound volume is not a public record giving notice to consumers, and that

it was the duty of appellee to actually notify its customers using current for lighting and power purposes of its combined cheaper rate.

Under its franchise and contract, appellee was required to file its schedules of rates with the board of public works and this was all it was required under the ordinance or contract to do to bring notice to its customers. The filing of schedules G-1 to G-3, inclusive, with the board of public works, brought to present and prospective consumers information as to rates and conditions, upon which they were available, and this being done, it was not essential that individual notice be given to the consumer. Kansas City S. R. Co. v. C. H. Albers Commission Co., 223 W. S. 573, 32 S. Ct. 316, 56 L.Ed. 556; Berwind-White Coal Mining Co. v. Chicago & E. R. Co., 235 U.S. 371, 35 S.Ct. 131, 59 L.Ed. 275; Turner, etc., Co. v. Chicago, M. & St. P. R. Co., 271 U. S. 259, 46 S. Ct. 530, 70 L. Ed. 934; Harrison Electric Co. v. Citizens' Ice & Storage Co., 149 Ark. 502, 232 S. W. 932, P. U. R. 1921E, 674; Dekler v. Atlantic City Electric Co., P. U. R. 1926B, 351.

In Spear & Co. v. Public Service Service Commission, supra, it is said:

"Complainant contends further that if optional rates are proper, it is the duty of the company to calculate which will be the cheapest for each consumer and to bill him upon that basis. In practice such a procedure would be well nigh impossible. A utility had the duty to make proper classifications of its service and to prescribe rates accordingly, but having done this and having made all proper information available to its patrons, its obligation has been met. No public service company is advised beforehand what amount of use a given customer will make of its service or how efficiently it will be taken, as is illustrated by the conditions at complainant's store where rate 'W' was first adopted and then discarded."

Our conclusion is that utility companies may make special or optional rates based on reasonable classifications and that such classifications do not amount to illegal discrimination; that the filing of these schedules of special or optional rates with the board of public works was all the notice necessary to be given appellee's

patrons, and that the rates fixed by schedules G-1 to G-3, inclusive, were at all times available to appellant at its option if it cared to comply with the required conditions.

Wherefore the judgment is affirmed.